# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

FILED

MAR 2 3 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. **'15 MJ 0896** |
| Apple silver iPhone, with IMEI 35444606678621 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A-4

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | conspiracy to distribute cocaine |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nicholas C. Beretta, Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/20/15

_____
*Judge's signature*

City and state:  San Diego, CA

William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-4

### DESCRIPTION OF PROPERTY TO BE SEARCHED

Apple silver iPhone, with IMEI 35444606678621, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT B

### Description of Items to Be Seized

The following evidence to be searched for and seized pertains to violations of Title 21, United States Code, §§ 841(a)(1) and 846 (conspiracy to distribute cocaine):

1.      Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

      a.      tending to indicate efforts to distribute cocaine, including the transportation of proceeds as payment for cocaine;

      b.      tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to distribute cocaine;

      c.      tending to identify co-conspirators, criminal associates, or others involved in the distribution of cocaine;

      d.      tending to identify travel to or presence at locations involved in the distribution of cocaine, such as stash houses, load houses, or delivery points;

      e.      tending to identify the user of, or persons with control over or access to, the subject phone; or

      f.      tending to place in context, identify the creator or   recipient of, or establish the time of creation or receipt of communications, records, or data above.

# **A F F I D A V I T**

I, NICHOLAS C. BERETTA, being duly sworn, declare and state:

## I

## **TRAINING AND EXPERIENCE**

1.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     I have been a Special Agent with the United States Drug Enforcement Administration (DEA) for sixteen years and am currently assigned to the Integrated Narcotics Task Force (NTF), San Diego, California. This multi-agency task force focuses on the dismantling of trafficking organizations operating within Southern California. Prior to my assignment to the NTF, I was assigned to the DEA Financial Investigative Group and to three general enforcement groups focusing on major Mexican trafficking organizations.

3.     As a federal law enforcement officer for sixteen years, I have received formal training, as well as extensive on the job experience and training, regarding the investigation of the importation, transportation, sales, manufacturing and distribution of controlled substances, and the laundering of drug proceeds.  I have participated in investigations which involved the use of electronic surveillance techniques.  I have investigated illicit narcotic and controlled substances that have resulted in arrests, indictments, trials and convictions. While participating in these and other criminal investigations, I have executed search warrants on businesses, residences, vehicles, storage facilities, email accounts, and mobile telephones.  I have also participated in undercover operations which involved the sale, purchase, transportation and importation of controlled substances and illicit narcotics.  I have participated in

1

investigations in which drug traffickers also relied heavily upon telephone communication and other electronic devices as a means of communicating with their associates.   I have interviewed individuals who have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs, and controlled substances.

4.   Based on my training and experience, I have become familiar with the methods utilized in narcotics trafficking operations and the unique trafficking patterns employed by narcotics organizations.   I have also spoken with other law enforcement officers about their experiences and the results of their investigations and interviews.   I have become knowledgeable of the methods and modes of narcotics and money laundering operations and the language, coded language, and patterns of drug abuse and trafficking.   I have become familiar with the methods of operation typically used by drug traffickers.   I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances.   I have also become familiar with the methods used by such individuals to avoid detection by law enforcement, including the frequent use of:   multiple cellular telephones, including those that are subscribed to in the names of other persons or no name at all, prepaid cellular telephones, counter surveillance techniques, coded and ambiguous language, multiple vehicles, and false identities.

## II

## PURPOSE OF AFFIDAVIT

5.   This affidavit is in support of an application by the United States of America for search warrants to search the following mobile telephones:

2

a. AT&T black/blue flip phone, with international mobile equipment identifier ("IMEI") 865651027461635 (described in Attachment A-1);

b. AT&T black/blue flip phone, with IMEI 865651020518068 (described in Attachment A-2);

c. Samsung black flip phone, model SPH-M270, with mobile equipment identifier ("MEID") 268435462913055981 (described in Attachment A-3);

d. Apple silver iPhone, with IMEI 35444606678621 (described in Attachment A-4);

e. Apple white iPhone, model A1532, with IMEI 013838004728414 (described in Attachment A-5);

f. LG black phone, model LS620, with MEID 70113183810109029 (described in Attachment A-6); and

g. Samsung grey Galaxy S5, model SM-G900T, with IMEI 353682061141519 (described in Attachment A-7) (collectively referred to as the "Subject Telephones")

6.    Authorization is sought to search the Subject Telephones for items which constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely: conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as described in Attachment B.

7.    The following is based on my own investigation and consultation with other law enforcement agents experienced in investigating drug trafficking organizations. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only the facts necessary to establish

3

foundation for the requested warrant.  Conversations and discussions below are set forth in substance unless noted.  My interpretations of certain statements are set forth in parentheses or brackets.  Dates, times, and amounts are approximate.

### III

## PROBABLE CAUSE

8.     This investigation targets the drug trafficking activities of Enriqueta NAVARRETE, Flavio TAVERAS, Gloria NAVARRETE, Adriana NAVARRETE, David NAVARRETE [GLORIA, ADRIANA and DAVID are ENRIQUETA's adult children], Carlos LOPEZ,  Adalberto Hernan SAMANIEGO-Payan, Marisela PAYAN, Tomas HERNANDEZ, Maria LUGO and others.

9.     The NAVARRETES and their associates traffic in cocaine, sending cars loaded with cocaine to the New York area and receiving the cars back in Chula Vista, California loaded with drug proceeds.  The cars are sent to the New York area and back to Chula Vista using commercial car carriers (semi-tractor trucks).  As set forth below, the NAVARRETES also sometimes ship narcotics via common carriers like UPS.

10.     On January 14, 2015, United States District Judge Anthony J. Battaglia authorized the renewed interceptions of wire and electronic communications over TT-1; the renewed interception of wire communications over TT-2 and TT-3; the initial interception of wire communications over TT-4; the renewed interception of electronic communications over TT-6; and the initial interception of wire and electronic communications over TT-7 and TT-8.

11.     At least as early as Monday January 26, 2015, ENRIQUETA and TAVERAS began coordinating the shipment of cocaine from San Diego to the New York metropolitan area via UPS.  On January 26, 2015, agents intercepted a call between ENRIQUETA on TT-7 and TAVERAS on (929) 248-1374 during which they

discussed the arrival of Tomas Hernandez and Guillermo Jimenez in San Diego to assist with preparing and shipping the parcels. ENRIQUETA said, "I had not called you, but I am now here with the kid [probably SAMANIEGO, a cocaine source of supply]. TAVERAS said, "I am happy to hear that." ENRIQUETA said, "However, they only work on the weekends, so we are planning that it [the preparation of the cocaine-loaded parcels] is going to happen this weekend." TAVERAS asked, "So, it [the shipment of the cocaine] is going to be until next week?" ENRIQUETA replied, "No, it is this week that just started, but it has to take place over the weekend. We are going to keep trying and we hope that nothing changes." TAVERAS agreed, "It has been too long [since cocaine has been shipped] already." Later in the conversation, ENRIQUETA said, "I do not want to tell you what day exactly, to send the young man [Jimenez], but it will have to be on a weekend." TAVERAS said, "We will look into that, because it is going to be for the weekend, Saturday or Sunday right?" ENRIQUETA replied, "That is correct, it has to be on a Saturday. Actually, it depends on the loan [the amount of cocaine] I get; if it is a small loan it will be just Saturday. If I am allowed to double [amount of cocaine] it will be both Saturday and Sunday." TAVERAS said, "You have to remember that the guy [Hernandez] has to head up there as well. Tomas is going to be the one to organize all that [the packaging and shipping], right?" ENRIQUETA replied, "It does not necessarily have to be him [Hernandez] if your guy can do it on his own, and once everything was confirmed, this guy [Hernandez] can come see me and I can explain it to him. If you want the other one [Jimenez] can come too." TAVERAS said, "The other one [Hernandez] has experience. I prefer for him [Hernandez] to head up there even when it is the first time..." ENRIQUETA interrupted TAVERAS and said, "This kid [SAMANIEGO] also has experience. He is the one who put together the beds

5

[bundles of cocaine that are to be shipped] and stuff." TAVERAS asked who she was referring to. ENRIQUETA replied, "The little one who is here [SAMANIEGO, who is physically small]. This is the one who taught Tomas the ropes [how to pack cocaine for shipment]. I want Tomas to be here so that he can take care of the errands and such [things that need to be done, like buying packing supplies]." TAVERAS said, "We will use him [Hernandez]. That is not a problem."

12. On January 28, 2015, agents intercepted a call between ENRIQUETA on TT-7 and TAVERAS on (929) 248-1374 during which they continued to coordinate the travel of Hernandez and Jimenez to San Diego to package and ship cocaine. ENRIQUETA said, "I talked to Tomas, and he says he could come [to San Diego] any day since he has family here [Hernandez does in fact have a sister in El Cajon, California]." TAVERAS said, "Oh, perfect, perfect. So then the perfect day for him [Hernandez] to go up there would be on Friday, right?" ENRIQUETA said, "I say Friday would be good."

13. On Friday January 30, 2015, Tomas Hernandez flew into San Diego, arriving at San Diego Airport in the morning. Hernandez was picked up by ENRIQUETA, who was accompanied by DAVID and SAMANIEGO. Hernandez was driven to a shopping center on H Street in Chula Vista, California, where he got into a Nissan Altima and drove away.

14. Later on January 30, 2015, at 6:48 p.m., agents intercepted a call between ENRIQUETA on TT-7 and TAVERAS on (929) 248-1374 during which they discussed the delivery of the cocaine and continued to coordinate Jimenez's arrival to San Diego. TAVERAS asked, "Did the taxi [vehicle loaded with cocaine] arrive okay over there [in San Diego]?" ENRIQUETA said, "Yes. Thank God, they [the packages of cocaine] are okay. In the morning." TAVERAS said, "Oh, I am glad."

ENRIQUETA asked, "What did you end up agreeing on with Negro [Jimenez, who is Dominican and darkly complected]?  You have not gotten him [Jimenez] a [plane] ticket yet, right?" TAVERAS said, "He [Jimenez] told me he was waiting for your call." ENRIQUETA said, "Oh, I did tell him that. Well, do you think he [Jimenez] might be able to find a flight to leave early tomorrow?"  TAVERAS said, "Yes, of course. Let me check into that and I will call you back, okay?"  ENRIQUETA said, "Yes, please. All right then." TAVERAS said, "I do think it will be possible." During an intercepted call a little later, at 7:38 p.m., TAVERAS said, "I have everything coordinated already. He Jimenez will arrive there [in San Diego] tomorrow by 11:30 [a.m.]."

15.    On January 31, 2015, Guillermo Jimenez flew into San Diego.  Even though Jimenez was in San Diego and geo-location of TAVERAS's phone placed him in south Florida, TAVERAS continued to act as an intermediary between ENRIQUETA and Jimenez, coordinating a meeting between them.  For example, on January 31, 2015, at 4:01 p.m., agents intercepted a call between ENRIEQUETA on TT-7 and TAVERAS on (929) 248-1374.  ENRIQUETA asked, "Is Negro [Jimenez] available right now?"  TAVERAS said, "Yes, he is available.  He is just waiting so he could go visit you." ENRIQUETA said, "That's good." TAVERAS asked. "Where do you want him [Jimenez] to meet with you?"  TAVERAS said, "He [Jimenez] told me that he needed a bed and that he was stranded, but I did not asked where he was." ENRIQUETA said, "Ask him [Jimenez]. Do you remember the E [Street]? I remember that he [Jimenez] and his brother told me that they went to eat nearby there. By the E [Street]. Tell him [Jimenez] by the Vons, and then you [TAVERAS] call me back."

16.    On January 31, 2015, 6:54 p.m., agents intercepted a call between ENRIQUETA on TT-7 and TAVERAS on (929) 248-1374 during which the two

7

continued to discuss the packaging and shipping of cocaine. ENRIQUETA asked, "Did Negro [Jimenez] talk to you?" TAVERAS said, "I have not talked to him yet, because he was on the move and he told me that he will call me once he was at his crib [hotel/place where he was staying]." Later in the call, ENRIQUETA stated, "They [ENRIQUETA, SAMANIEGO, Hernandez, and Jimenez] will start the process tomorrow [prepare the cocaine to be shipped], so they can leave [three parcels containing the cocaine can be shipped] the day after tomorrow [Monday February 2, 2015.]. We are going to do it through the fast one [UPS 3-day service]. I'm looking into getting some accounts [shipping accounts with UPS] to help out." TAVERAS said, "That is perfect." Later in the call, TAVERAS said, "Depending on that stuff arrival [delivery of the cocaine]. How many days will be?" ENRIQUETA said, "Three." [Two of the three parcels sent by Hernandez on February 2, 2015, were sent via UPS 3-day shipping.]

17.    On February 1, 2015, agents surveilled Jimenez's car (a rented VW Jetta), which he drove to the Guitar Center in La Mesa, California. Agents saw Hernandez, Jimenez, ENRIQUETA, and SAMANIEGO exit the Guitar Center with three boxes containing speaker cabinets. Surveillance video from the Guitar Center showed the four at the check-out counter with the speakers. The video showed ENRIQUETA purchasing the speakers with cash. When asked by the Guitar Center cashier for information, ENRIQUETA provided the name "Maria Garcia" from "Mexico, California." Once the three boxes were loaded into the trunk of the Jetta, the four subjects returned to a parking lot on H Street in Chula Vista. ENRIQUETA and SAMANIEGO exited Jimenez's Jetta and entered ENRIQUETA's car. Hernandez also exited Jimenez's car and got in the car he had left in the H Street parking lot. The four

subjects eventually drove in a three-car convoy to 1606 Calle Atria, #6, Chula Vista, California, a stash house that ENRIQUETA had rented the day before.

18.    Later on February 1, 2015, agents saw Hernandez and Jimenez leave the suspected stash house in Jimenez's Jetta and drive to an Office Depot in Chula Vista, where the two purchased packaging materials, including a large bag of Styrofoam packing peanuts. Hernandez and Jimenez were then observed going to a Lowe's in the same shopping center, where they purchased tools, including a set of screw drivers and drill bits. Based on my training and experience and the facts set forth in this affidavit, I believe that the tools were purchased to disassemble the speaker cabinets so that they could be loaded with cocaine.

19.    On February 2, 2015, at about 8:15 a.m., agents saw Hernandez and Jimenez depart 1606 Calle Atria, #6, in the Jetta. The two were observed entering the UPS Store on Olympic Parkway in Chula Vista, where they purchased three large brown boxes, which they put in the trunk of the Jetta. An agent continued to surveill the UPS Store. About an hour later, ENRIQUETA arrived to the UPS Store with SAMANIEGO. SAMANIEGO exited the car and sat outside a nearby Starbucks, and ENRIQUETA departed in the car.

20.    Meanwhile, back at 1606 Calle Atria, #6, at about 9:15 a.m., an agent saw Jimenez throw out garbage in a communal Dumpster. [After purchasing the boxes at the UPS store, Jimenez and Hernandez had returned to the stash location.] About fifteen minutes later, Hernandez and Jimenez departed the stash house in separate cars and drove to the UPS Store on Olympic Parkway in Chula Vista. (An agent searched the Dumpster and learned that Jimenez had thrown out the packaging for the tools described above and what appeared to be drug ledgers.) Jimenez parked his car and

joined SAMANIEGO outside the Starbucks. Hernandez exited his car and carried a large brown UPS box into the UPS Store on his shoulder. Hernandez then left the UPS Store without the box. About one half hour later, agents interviewed the three employees working at the UPS Store. One of the employees identified Hernandez as the individual who shipped the parcel by describing his clothes (leather jacket and purple shirt). Hernandez was also identified as the individual who had purchased three large boxes earlier that morning at the UPS Store. Hernandez used a fictitious name, "Jose Gomez," as the sender, and indicated a non-existent return address with a partial zip code, "5060 Estrella Avenue, San Diego, CA 9205."

21.    Agents took the parcel, which was addressed to a UPS store in Tarrytown, New York, and met with DEA TFO John McGill and his narcotics detector dog Kilo. According to TFO McGill, Kilo positively alerted to the parcel for the presence of controlled substances. Later on February 2, 2015, agents received Court authorization to search the parcel (15mj0327). Inside the brown UPS box was one of the speaker boxes that had been purchased at Guitar Center on the previous day, which still contained the stereo subwoofer. The speaker box was packed in the larger UPS box with Styrofoam peanuts. Hidden within the speaker itself, in a natural void (accessed with the use of a screwdriver), agents found about 3.84 kilograms of a white powdery substance that field-tested positive for cocaine.

22.    On February 2, 2015, after Hernandez dropped off the above-described parcel at the UPS Store in Chula Vista, agents followed him back to the stash house located at 1606 Calle Atria, #6, Chula Vista. A short time later, Hernandez drove away from the stash house, and an agent saw in Hernandez's rear seat a parcel nearly identical to the cocaine-loaded parcel discussed above. Agents followed Hernandez to the UPS Store located at 8810 Jamacha Blvd, Spring Valley, CA 91977. Hernandez

retrieved the package from his back seat and entered the UPS Store.  Hernandez came out after several minutes without the package.  After Hernandez left the store, agents entered the UPS Store and retrieved the shipping information from the box that Hernandez dropped off:  Sent to: Angel Flores 333 Mamaroneck Ave, PMB #324, White Plains NY 10605; Shipped from: Martin Lopez 358 North 2nd St, El Cajon, CA 92021 with tracking number 1Z31E0R41297974356.  Hernandez also sent a third parcel that afternoon addressed to a UPS store in Fairfield, Connecticut.  These other two parcels were eventually searched and were found to contain an additional 6 kilograms or so of substance that field tested positive for cocaine.

23.    Based on toll analysis, TT-7 used by ENRIQUETA was used almost exclusively to communicate with (929) 248-1374, and (929) 248-1374 was used almost exclusively to communicate with TT-7.  In my experience, drug traffickers will use a single facility to communicate exclusively with one other conspirator in an attempt to insulate themselves from the larger conspiracy and elude law enforcement.  Limiting communications in this manner decreases the probability that the user of the phone will speak with somebody whose phone is being intercepted by law enforcement.  Moreover, because a single phone is often used to communicate with a single conspirator, this requires drug traffickers like TAVERAS to use multiple telephones to communicate with various associates.

24.    The phone assigned number (929) 248-1374 that was used to coordinate the shipments of cocaine described above was geo-located to 19049 SW 80th Ct., Cutler Bay, Florida.  On February 9, 2015, U.S. deputy Marshals executed an arrest warrant for Flavio TAVERAS at that address and seized the Subject Telephones pursuant to his lawful arrest.  Identified as Exhibit N-29, the Subject Telephones were received by DEA agents in the Southern District of California on February 20, 2015,

11

and are currently held in the DEA San Diego Field Division non-drug evidence storage locker.

25.    On March 5, 2016, a grand jury in the Southern District of California returned an indictment charging Flavio TAVERAS and others with conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (15cr0596-BEN).

26.    Based on my training and experience in narcotics investigations, and my investigation of this case, I believe that TAVERAS is involved in the distribution of cocaine and that he uses the Subject Telephones to facilitate his drug-trafficking activity.   Accordingly, I believe that there is probable cause to search the Subject Telephones for items which constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely: distribution of controlled substances, and conspiracy to do same (21 U.S.C. §§ 841, 846).

## CELL PHONE SEARCH METHODOLOGY PARAGRAPH

27.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within

the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28.     Following the issuance of this warrant, I will collect the Subject Telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to the requested warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

//
//
//
//
//
//
//
//
//

13

## CONCLUSION

30.     Based upon all of the above information, my training and experience, and discussions with other law enforcement agents and officers, I believe that there is probable cause to believe that the Subject Telephones, described in Attachments A-1 through A-7, will contain the items to be seized as described in Attachment B, which evidence violations of the following federal laws:     Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to distribute cocaine.   Thus, I respectfully request that search warrants be issued for the Subject Telephones.


NICHOLAS C. BERETTA
Special Agent
Drug Enforcement Administration


SUBSCRIBED and SWORN to before me

this 20 day of March, 2015.


HONORABLE WILLIAM V. GALLO
United States Magistrate Court Judge

14

## ATTACHMENT A-1

### DESCRIPTION OF PROPERTY TO BE SEARCHED

AT&T black/blue flip phone, with IMEI 865651027461635, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## **ATTACHMENT A-2**

### DESCRIPTION OF PROPERTY TO BE SEARCHED

AT&T black/blue flip phone, with IMEI 865651020518068, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT A-3

## DESCRIPTION OF PROPERTY TO BE SEARCHED

Samsung black flip phone, model SPH-M270, with MEID 268435462913055981, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT A-4

### DESCRIPTION OF PROPERTY TO BE SEARCHED

Apple silver iPhone, with IMEI 35444606678621, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT A-5

### DESCRIPTION OF PROPERTY TO BE SEARCHED

Apple white iPhone, model A1532, with IMEI 013838004728414, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT A-6

## DESCRIPTION OF PROPERTY TO BE SEARCHED

LG black phone, model LS620, with MEID 70113183810109029, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

# ATTACHMENT A-7

## DESCRIPTION OF PROPERTY TO BE SEARCHED

Samsung grey Galaxy S5, model SM-G900T, with IMEI 353682061141519, currently in the possession of the Drug Enforcement Administration, San Diego Field Division, 4560 Viewridge Avenue, San Diego, CA 92123, in the non-drug evidence storage locker and in a bag identified as Exhibit N-29.

## ATTACHMENT B

Description of Items to Be Seized

The following evidence to be searched for and seized pertains to violations of Title 21, United States Code, §§ 841(a)(1) and 846 (conspiracy to distribute cocaine):

1.    Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a.    tending to indicate efforts to distribute cocaine, including the transportation of proceeds as payment for cocaine;

    b.    tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to distribute cocaine;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of cocaine;

    d.    tending to identify travel to or presence at locations involved in the distribution of cocaine, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.    tending to place in context, identify the creator or   recipient of, or establish the time of creation or receipt of communications, records, or data above.